## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| Stephen J. Green, | ) | Case No. 2:24-cv-07085-BHH-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Brian Stirling, *et. al*., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Stephen J. Green ("Plaintiff" or "Green"), a state prisoner proceeding *pro se*, filed this civil action on December 6, 2024, alleging violations of his First, Eighth, and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983 based largely on certain deprivations at his prior correctional institutions. (Dkt. No. 72.) Before the Court are Defendants' Motions to Dismiss (Dkt. Nos. 92; 93) and Plaintiff's "Motion for Temporary Restraining Order and/or Preliminary Injunction." (Dkt. No. 96.)[1] For the reasons set forth below, the undersigned recommends the motions be denied.

## BACKGROUND

The instant case stems largely from events that occurred while Plaintiff was housed at Perry Correctional Institution ("Perry") and Broad River Correctional Institution ("Broad River") from approximately July 2021 through April 2025. (Dkt. No. 72.) Plaintiff alleges that when he was transferred to Perry in July of 2021, he was placed in "SSR Supermax" for one week and then transferred to the "Restricted Housing Unit" ("RHU"). (*Id*. at 6.) Plaintiff was housed in the RHU at Perry for eight months without any "classification review hearing of any type." (*Id*. at 7.) In February of 2022, Plaintiff "was taken before the RHU Classification Review Board." (*Id*.) At that

---

[1] Pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.), pretrial proceedings in this action have been referred to the undersigned United States Magistrate Judge.

time, his custody was reduced to SD Level-3 "due to being indicted in the prison riot at Lee Correctional Institution on 4/18/18." (*Id*.) Plaintiff "questioned the custody reduction" when he spoke to Warden Charles Williams. (*Id.* at 10.) Williams told Plaintiff he placed Plaintiff "on (SD) Security Detention" at the instruction of Defendant Dennis Patterson. (*Id*.) When Plaintiff asked how long he would be held in SD, Williams responded that Plaintiff would remain on SD until Plaintiff resolved "the state charges placed against" him, stemming from the Lee prison riot. (*Id*. at 10–11.)

Although Plaintiff subsequently received formal reviews every 90 days, Plaintiff disputes the sufficiency of those "sham" hearings. (*Id*. at 8.) Plaintiff alleges that when the 90 day reviews "would come up, Plaintiff would be approached by RHU staff and told there was no need for Plaintiff to come to the review since Plaintiff's status was not going to change." (*Id.* at 11.) "When Classification [Defendant] Mr. Holbrook would make rounds on RHU, Plaintiff would question Mr. Holbrook concerning Plaintiff's placement/custody and or the lack of advancement in custody or custody level." (*Id*. at 12.) Mr. Holbrook replied that "Plaintiff would not be advanced from SD Level-3 and would remain on RHU until the powers that be in headquarters instructed him otherwise." (*Id.*) From July 2021 though January 2023, "Plaintiff was denied the same policy prescribed advancements in custody level afforded to other inmates on RHU whom were likewise criminally charged in connection with the 2018 Lee Corr. Inst. riot." (*Id.*)

From July 2021 through January 2023, Plaintiff was subjected to a "total ban placed on Plaintiff's access to a telephone or tablet to contact or communicate with immediate family or friends." (*Id.* at 13.) During this time, Plaintiff was also "subjected to dehumanizing daily strip searches/cavity searches" and he was "denied visitation of any kind with immediate family or friends." (*Id*.) Plaintiff alleges he was housed "in a cell smaller than a parking space" for twenty-

three hours a day "with a sheet metal covering the window to prevent any view of nature or natural surroundings" and "a solid metal door outside of that, with an observation window that allowed view of a wall mounted TV." (*Id.*) Plaintiff further alleges that he was "subjected to wearing: (1) belly chain w[ith] cuffs; (2) two handcuffs with black security box; [and] (3) a set of shackles with hobble chain attached to black box handcuffs every time Plaintiff was removed from cell [sic]." (*Id.* at 13–14.) During this time, Plaintiff was also "denied the ability to engage in productive activities like art (hobby craft), educational programs, voluntary work, congregate religious programming, congregate recreational or social programming." (*Id.* at 13.)

According to Plaintiff, "[a]cting under the instruction of Director Brian Stirling (Deputy Director), Joel Anderson (Assistant Deputy Director), Dennis Patterson, Mr. Holbrook (Classification Worker), along with other staff members at Perry Corr. Inst. subjected Plaintiff to prolonged/indefinite solitary confinement, atypical and significant hardships outside the normal incidents of prison life." (*Id.* at 16–17.) Plaintiff alleges these conditions caused him to "experience psychological, emotional, and physiological harms," which he reported to the "Qualified Mental Health Personnel." (*Id.* 14.)

Plaintiff alleges that these "same conditions of confinement and atypical and significant hardships" continued when Plaintiff was transferred to Broad River and placed in RHU in January 2023. (*Id.* at 17.) According to Plaintiff, while at Broad River from January 2023 through November 2023, he was subjected to the same: (1) "total ban" on "telephone/tablet access"; (2) denial of "visitation with immediate family or friends"; (2) housing "in a cell smaller than a parking space" for twenty-three hours a day; (3) "windows that denied any view of natural surroundings or nature itself"; (4) "a solid metal door with a 8 by 8 observation window that allowed view of a wall mounted TV"; (5) "daily dehumanizing strip searches"; and (6) denial of "the ability to engage

3

in productive activities like art (hobby craft), educational programs, voluntary work, congregate religious programming, congregate recreation or social programming." (*Id*. at 17–18.)

Plaintiff alleges he was subject to the same "sham" classification reviews at Broad River, wherein he was "denied the same level advancements in custody level afforded to other inmates on RHU whom were likewise criminally charged in connection with the 2018 Lee" prison riot. (*Id*. at 21, 24.) According to Plaintiff, "one month after Plaintiff arrived at Broad River," he was taken to a "review board" and his "custody was reduced to Security Detention Level-2" from Security Detention Level-3. (*Id*. at 18.) At this February 15, 2023 hearing, Plaintiff "questioned" Associate Warden Canning and Defendant Classification Worker Ms. Greene about the reason for his custody reduction "when Plaintiff was disciplinary free." (*Id*. at 19.) Plaintiff alleges that he did not receive a satisfactory response. Plaintiff attended another "review board" hearing on April 11, 2023, where his "custody was returned/advanced back to SD Level-3" due to "security concerns." (*Id*.) On July 13, 2023, Plaintiff attended another "RHU Classification Review Committee" hearing, where he was told he would "remain SD Level-3" due to "being open homicide under investigation." (*Id*. at 20.) Plaintiff disputes that he was still under investigation for the Lee prison riot at this point. (*Id*.) At "another review" on January 16, 2024, Plaintiff was told he would "remain SD Level-3" due to the "open homicide charge." (*Id*.) Plaintiff alleges he "had been disciplinary free over two years" at this point. (*Id*. at 20–21.)

Plaintiff alleges that "following each RHU review," he "would ask staff (to include but not limited to) (Classification) Ms. Greene and Ms. Shoemaker why wasn't Plaintiff afforded proper level advancements." (*Id*. at 22.) According to Plaintiff, Canning stated that Plaintiff "would not be advanced in custody and would remain SD Level-3 until the Lee County riot charges were resolved." (*Id*.) Plaintiff alleges that Ms. Greene and Ms. Shoemaker stated that "the decision went

4

above them." (*Id.*) Plaintiff alleges that when he asked why he "was being held on lock up and denied a path to release or any advancement," he was told the decision for him "to be held in lock-up goes above institutional classification." (*Id.* at 23.) Plaintiff alleges Defendant Willie Davis told him, "once your legal issues have been resolved SCDC will determine where you will be located/assigned." (*Id.*) Plaintiff alleges that he "informed (Director) Brian Stirling via request to staff April 18, 2023 . . . of the denial in advancement, and no path to release from RHU prolonged solitary confinement." (*Id.* at 25.)

According to Plaintiff, "[a]cting under the instruction of (Director) Brian Stirling, (DDO) Joel Anderson, (ADDO) Dennis Patterson, AW Canning, (Classification) Ms. Greene, and Ms. Shoemaker along with other staff members at Broad River Corr. Inst., subjected Plaintiff to prolonged/indefinite solitary confinement, and atypical and significant hardships outside the normal incidents of prison life." (*Id.* at 24.) Plaintiff alleges that the conditions at Broad River caused him to continue to experience "psychological, emotional, and physiological harms," which he reported to the "Qualified Mental Health Personnel." (*Id.* at 25.) Plaintiff alleges that, despite the need for a "full mental health evaluation," he never received one at Perry or Broad River and, therefore, his "undiagnosed mental health illnesses" have not been "properly treated." (*Id.* at 26.) Plaintiff alleges that Warden Canning, Ms. Greene, Ms. Shoemaker, Warden Nelson, Joel Anderson, and Dennis Patterson "continued to hold Plaintiff under harmful conditions knowingly." (*Id.* at 27.)

In November 2023, Plaintiff was moved from RHU at Broad River to "(SSR) 'Supermax' which was located on Saluda-B side of RHU" at Broad River. (*Id.* at 28.) Plaintiff alleges this was part of a "campaign of retaliation on behalf of (Special Prosecutor) Barney Giese and under the order of (Director) Brian Stirling, (DDO) Joel Anderson, [and] (ADDO) Dennis Patterson" due to

Plaintiff's rejection of a plea offer by the state related to charges from the Lee prison riot. (*Id.* at 29.) Plaintiff alleges that the "retaliation had an adverse action that stopped Plaintiff from discussing legal options and strategies with other co-defendants and/or prevented Plaintiff from doing so" and "chilled Plaintiff's exercise of Plaintiff's First Amendment rights" and that the "adverse action did not reasonably advance or reasonably advance a legitimate penological interest/goal." (*Id.* at 37–38.)

According to Plaintiff, the move to SSR subjected him "to added restrictions in furtherance of retaliation, and along with being denied phone/tablet access, Plaintiff was also denied even the mental health radio provided to other/all RHU and SSR inmates." (*Id.* at 29.) Plaintiff alleges that "two to three weeks" after this move, Warden Nelson "told Plaintiff that Joel Anderson (Deputy Director) and Dennis Patterson (Assistant Deputy Director) said to move Plaintiff and to take all of Plaintiff's property including Plaintiff's mental health issued radio." (*Id.* at 29–30.) Warden Nelson further stated that Plaintiff "would remain housed as is, until Plaintiff resolved the" Lee Corr. Inst. riot charges of 2018. (*Id.* at 30.) Around that same time, "MX (Supermax) inmates were moved to Saluda B-side while the SSR (Supermax) building was being renovated." (*Id.*) Plaintiff alleges that Deputy Warden Ms. Holis stated that although Plaintiff "was not a SSR 'Supermax' inmate," Plaintiff "would be housed and treated as such with the exception of no telephone/tablet or visitation per Joel Anderson and Dennis Patterson." (*Id.*)

According to Plaintiff, "[a]cting under the instruction/order of (Director) Brian Stirling, (DDO) Joel Anderson, (ADDO) Dennis Patterson, Mr. Holis, Ms. Owens, Mr. Parker, an[d] Mr. Roe subjected Plaintiff to sham review hearings which caused/inflicted prolonged/indefinite solitary confinement, and atypical and significant hardship outside the normal incidents of prison life." (*Id.* at 34.) Plaintiff alleges the conditions in SSR were "even more restrictive [than] RHU

and Plaintiff was housed under not just atypical and significant hardship, but aggravated conditions, as Plaintiff's cell was now completely covered in metal with exception of the floor and ceiling." (*Id.* at 33.) Also, "strip searches were more invasive, and happened with more frequency." (*Id.*) Plaintiff was also "was denied the ability to engage in productive activities like hobby craft, educational programs, voluntary work, congregate religious programming, [and] congregate recreational or social activities." (*Id.*) Plaintiff alleges his "placement on SSR Supermax, under aggravated and retaliatory conditions," caused a "worsening of already existing psychological, emotional, and physiological harms/problems," which he reported to "SSR Supermax staff" including Mental Health Officer Roe. (*Id.* at 34.)

In March 2024, Plaintiff "was taken in front of another sham review board which included (Deputy Warden) Holis, (Captain) Parker, (Mental Health Worker) Roe, and (Classification) Ms. Owens." (*Id.* at 30–31.) Plaintiff's custody was reduced "from SD Level-3 to (SSR) Supermax MX-Level-2, punitively, without a meaningful review" and without "any legitimate penological reason, with retaliatory purpose and malicious intent to punish and or cause harm." (*Id.* at 35.) Plaintiff alleges that "the multi-disciplinary committee is a sham as none of its members, Joseph Stines, Stacey Richardson, Brandon Byrd, Esther Labrador, [and] Stephenie Skewes, do anything but parrot Joel Anderson and/or Dennis Patterson, looking no further than the (DDO), (ADDO) Directive and simply repeating what is said." (*Id.* at 36.) Plaintiff alleges he "is discriminated against and/or denied equal protection, in relation to other inmates whom are similarly situated and charged with crimes stemming from the Lee Corr. Inst. riot." (*Id.* at 38.)

On January 8, 2025, Plaintiff "went in front of a review board," where Ms. Greene and Ms. Butler were present. (*Id.* at 39.) Plaintiff alleges that Ms. Greene and Ms. Butler stated "'the system' was showing Plaintiff had a[n] open homicide charge" despite Plaintiff showing them he

"had reached full adjudication back in September of 2024 on all criminal charges." (*Id.*) According to Plaintiff, they were "seemingly conducting Plaintiff's review based on outdated or false information, further highlighting how meaningless the review actually was." (*Id.*) "Following the filing of a civil action, Plaintiff was taken before an Emergency Institutional Classification Committee Review" on March 17, 2025. (*Id.* at 40.) At this review, "Plaintiff was simply 'recommended' to be released from (SD) Security Detention to Perry Corr. Inst. A-Dorm." (*Id.*) Two weeks later, Plaintiff was transferred from Broad River to Perry, and he "was in fact released from (SD) Security Detention and reassigned to A-Dorm (General Population)." (*Id.* at 40–41.)

On April 7, 2025, "Plaintiff was taken before an Inter-state Compact Review," without any prior notice. (*Id.* at 41.) "Within a matter of a few days, Plaintiff was transferred to another state over thirteen hours one way from South Carolina." (*Id.*) Plaintiff alleges he was "transferred to the Illinois Department of Corrections ("IDOC") at the instruction of (Director) Brian Stirling, (DDO) Joel Anderson, (ADDO) Dennis Patterson, [and] (Division Director Classification) Stacy Richardson." (*Id.*) According to Plaintiff, these four Defendants failed "to provide Plaintiff's medical records" to IDOC. (*Id.* at 42.) As a result, "IDOC medical staff is unaware of the extent of Plaintiff's injuries or medical needs, and thus [are] unable to properly treat Plaintiff's medical conditions." (*Id.*) Plaintiff alleges he has "mental health illnesses" as well as "chronic back pain" resulting from his "back injuries" of "spondylosis" and "spinal stenosis." (*Id.*)

According to Plaintiff, Stirling, Anderson, Patterson, Richardson, and SCDC were deliberately indifferent to Plaintiff's serious medical need for Plaintiff's psychotic medication to treat Plaintiff's mental illness" and were also deliberately indifferent to "Plaintiff's serious medical need for treatment of Plaintiff's two severe back injuries." (*Id.* at 42–43.) Plaintiff alleges these Defendants were "not only aware of Plaintiff's pending transfer to an out of state DOC, but were

directly responsible for said transfer, were aware, and/or should have been aware that Plaintiff, a mental health designated inmate, would have need of Plaintiff's mental health medication(s) and did not respond reasonably." (*Id*. at 43.) Plaintiff alleges he filed emergency grievances at IDOC stating that he "was/is designated as mental health level-4 and suffering from not receiving Plaintiff's psychotropic medication." (*Id.* at 44.) Plaintiff alleges he also filed an emergency grievance at IDOC complaining of "not receiving [his] sleeping meds . . . nor treatment for Plaintiff's back pain." (*Id*.) According to Plaintiff, IDOC responded that "Plaintiff's grievance was not an emergency." (*Id*.)

Plaintiff alleges that he was transferred "from IDOC's reception center . . . to Lawrence Corr. Center" and placed "on lock-up." (*Id*.) On April 29, 2025, "Plaintiff was reviewed (in absence/Plaintiff was not allowed to attend said hearing) and Plaintiff's custody was again punitively regressed to administrative detention, which is IDOC's version of (SD) Security Detention." (*Id.*) According to Plaintiff, "the receiving state (IDOC) is nothing more than an agent of the sending state" and, therefore, Stirling, Anderson, Patterson, Richardson, and SCDC "are aware of and responsible for Plaintiff's continued pro-longed solitary confinement/indefinite confinement." (*Id*. at 45.)

Plaintiff alleges that "since April 2025 (4) months," he has "been held on administrative detention, under atypical conditions of confinement at the direction, authorization, and/or approval of" SCDC, Stirling, Anderson, Patterson, and Richardson. (*Id.*) More specifically, Plaintiff claims he "has only been offered recreation five times in four months," and he is denied "structured programming (mental health group)." (*Id*.) Plaintiff further alleges he "is confined 24 hours a day, for weeks at a time, to a cell/room so small  Plaintiff could not do a push up in, which was without air conditioning of any type, and got so hot by mid-June there was a heat advisory issued and room

temperature was well into the upper nineties close to one hundred range easily." (*Id* at 45–46.) According to Plaintiff, his "window denies any view of natural surroundings or nature itself" and he is subject to "daily dehumanizing strip searches" and is denied "the ability to engage in productive activities like art, hobby craft, educational programs, voluntary work, congregate religious programming, congregate recreational or social programming." (*Id*. at 46.) Plaintiff further alleges he has "to wear belly chain, handcuffs shackles at all times when removed from the cell." (*Id.*) According to Plaintiff, SCDC, Stirling, Anderson, Patterson, and Richardson "are aware of and/or authorized Plaintiff being housed/held under physically as well as mentally harmful conditions, subjecting Plaintiff to cruel and unusual punishment." (*Id.*)

Plaintiff alleges his "back pain/injuries" worsened to the point he "could barely walk" by June 2025 and he "was not seen by medical for days," and thereafter he received "ineffective" medical treatment because "IDOC lacked Plaintiff's medical records." (*Id*. at 47.) Plaintiff alleges Stirling, Anderson, Patterson, Richardson, and SCDC were "not only aware of Plaintiff's pending transfer, [they] were responsible for it and were aware, or should have been aware, that Plaintiff would have need of his medical records." (*Id.*)

The Amended Complaint names the following individuals as Defendants: Brian Stirling, SCDC, Dennis Patterson, Joel Anderson, Willie Davis, Stacy Richardson, Jessica Salley, Mr. Holbrook, Ms. Shoemaker, Ms. Owens, Ms. Stubbs, Joseph Stines, Brandon Byrd, Esther Labrador, Stephanie Skewes, Ms. Greene, and Ms. Butler. (*Id.* at 1.) The Amended Complaint alleges Defendant Holbrook violated Plaintiff's Fourteenth Amendment "right to due process" by confining Plaintiff in RHU "without . . . meaningful review of any type from July 2021 up until February 2022." (*Id*. at 51.) The Amended Complaint alleges Defendants Richardson, Owens, Salley, Holbrook, Stines, Byrd, Labrador, Skewes, Greene, and Butler violated: (1) "Plaintiff's

Fourteenth Amendment right of due process" by denying Plaintiff meaningful review hearings related to his housing and custody level; (2) Plaintiff's Fourteenth Amendment "right to be free of discrimination" by denying Plaintiff the same policy prescribed level advancements allowed to similarly situated inmates; (4) Plaintiff's Eighth Amendment "right to be free from cruel and unusual punishment when Defendants placed/held Plaintiff on (RHU) and (SSR) under atypical conditions [and] significant hardships" and when they "continued to hold Plaintiff on (RHU) and (SSR) under atypical and significant hardships for years on end (2021 up until 2025)"; and (5) Plaintiff's Eighth Amendment "right to be free from cruel and unusual punishment when Defendants were deliberately indifferent to the excessive risk to inmate health arising from solitary confinement/prolonged solitary confinement."  (*Id*. at 51–58.) The Amended Complaint further alleges that Defendants Richardson, Owens, Stines, Byrd, Labrador, Skewes, Greene, Shoemaker, Salley, Butler, and Stubbs "engaged in retaliation against Plaintiff for engaging in protected conduct, exercising his [First] Amendment rights of the United States Constitution as well as Plaintiff's [Sixth] Amendment right to a speedy trial." (*Id*. at 59.)

The Amended Complaint also alleges that Defendants Holbrook, Stirling, Patterson, Anderson, and SCDC violated Plaintiff's Fourteenth Amendment "right to due process when Defendants held an involuntary Interstate Compact Review board hearing" without advance notice. (*Id*. at 59.) The Amended Complaint alleges Defendants Stirling, Anderson, Patterson, and SCDC violated Plaintiff's Fourteenth Amendment "right to due process and when they "authorized and/or were aware of Plaintiff's custody once again being punitively regressed" upon Plaintiff's arrival at IDOC. (*Id*. at 59–60.) Finally, the Amended Complaint alleges that Defendants Stirling, Anderson, Patterson, Richardson, and SCDC violated: (1) Plaintiff's Eighth Amendment right when they were "deliberately indifferent to Plaintiff's serious medical need for Plaintiff's

11

psychotropic medication" and when they "transferred Plaintiff out of state without benefit of Plaintiff's medication" and his "medical records"; (2) Plaintiff's Eighth Amendment right by "subjecting Plaintiff to cruel and unusual punishment and deliberate indifference to Plaintiff's serious medical needs" when Defendants "authorized/allowed Plaintiff to be held/housed in/on administrative detention indefinitely while also denying Plaintiff the constitutional guarantees and/or policies of the State of South Carolina/SCDC" specific to recreation time, structured programming, and "unstructured out of cell time"; (3) Plaintiff's Eighth Amendment right by placing "Plaintiff in unsafe, life threatening conditions, by transferring Plaintiff to IDOC, which houses and/or is proliferated by the very group members SCDC . . . accused Plaintiff of killing during a prison riot"; and (4) Plaintiff's Eighth Amendment right by placing "Plaintiff in unsafe, life threatening conditions by transferring Plaintiff to IDOC which houses Plaintiff in a cell lacking proper firefighting/fire suppressing equipment, such as a fire sprinkler." (*Id*. at 60–63.) Plaintiff seeks compensatory and punitive damages as well as injunctive relief. (*Id*. at 65–66.) Plaintiff signed the verified Amended Complaint on July 14, 2025. (*Id*. at 67.)

Plaintiff filed this action on December 6, 2024. (Dkt. No. 1.) On April 2, 2025, the undersigned declined to authorize service on and recommended the dismissal, *sua sponte*, of Defendants Joel Anderson, Brian Stirling, SCDC, Dennis Patterson and Willie Davis, finding the claims against these defendants were barred by the doctrine of *res judicata*. (Dkt. No. 13.) This recommendation was based on a settlement Plaintiff reached with these same Defendants in Case No. 2:24-cv-00267-BHH ("*Green I*").[2] The undersigned authorized service of process with respect to Defendants Stacy Richardson, Jessica Salley, Mr. Holbrook, Ms. Shoemaker, Ms. Owens, Ms. Stubbs, Joseph Stines, Brandon Byrd, Esther Labrador, and Stephanie Skewes. Thereafter, upon

---

[2] The District Judge adopted the April 2, 2025 Report and Recommendation on May 2, 2025. (Dkt. No. 29.)

leave of the Court, Plaintiff filed an Amended Complaint on July 22, 2025. (Dkt. Nos. 67; 70; 72.)

Relevant here, the Order granting Plaintiff leave to amend stated, *inter alia*,

> Here, the undersigned acknowledges that Anderson, Stirling, SCDC, Patterson, and Davis were dismissed as Defendants during initial review and not served with the original Complaint because the Court found Plaintiff's settlement agreement with these individuals in *Green I* barred the instant claims against them by the doctrine of *res judicata*. (Dkt. Nos. 13; 29.) That finding, however, was made based on the parties' submitted stipulation of dismissal in *Green I*—the actual settlement agreement was not in the record. The record now shows that the *Green I* settlement agreement specifies, in bold, that "[t]his Release . . . does not impact any other pending actions filed by Stephen J. Green." (Dkt. No. 66-13.) Notably, the instant action was pending when Plaintiff signed the settlement agreement in *Green I* on December 23, 2024. (*Id.*) Given these circumstances, and pursuant to the liberal construction of *pro se* pleadings, the undersigned finds it judicially efficient to allow Defendants to renew any arguments for dismissal in their response to the Amended Complaint pursuant to the Federal Rules of Civil Procedure.

(Dkt. No. 70 at 5–6.)

On August 21, 2025, separate Motions to Dismiss were filed by Defendants SCDC, Brian Stirling, Joel Anderson, Willie Davis, and Dennis Patterson ("Defendant Group A") and Defendants Holbrook, Owens, Richardson, Shoemaker, Salley, Stubbs, Stines, Byrd, Skews, Labrador, Greene, and Butler ("Defendant Group B"). (Dkt. Nos. 92; 93.) The next day, this Court issued an Order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the dismissal procedure and the possible consequences if he failed to adequately respond to the motions. (Dkt. No. 94.) Plaintiff filed a response in opposition on September 29, 2025 (Dkt. No. 131),[3] and Defendants filed separate replies on October 6, 2025. (Dkt. Nos. 142; 133.) On August 25, 2025, Plaintiff filed a Motion for Temporary Restraining Order and/or Preliminary Injunction. (Dkt. No. 96.) Defendants filed separate responses in opposition on September 5, 2025 (Dkt. Nos. 102; 103), and Plaintiff filed reply briefs on September 26, 2025 (Dkt. Nos. 129; 130). The Motions have been fully briefed and are ripe for review.

---

[3] Plaintiff received an extension of time to file his response in opposition. (Dkt. Nos. 117; 121.)

## STANDARDS OF REVIEW

### A.     Liberal Construction of Pro Se Complaint

Plaintiff brought this action *pro se*, which requires the Court to liberally construe his

pleadings. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Haines v. Kerner*, 404 U.S. 519, 520 (1972)

(per curiam); *Loe v. Armistead*, 582 F.2d 1291, 1295 (4th Cir. 1978); *Gordon v. Leeke*, 574 F.2d

1147, 1151 (4th Cir. 1978). Pro se pleadings are held to a less stringent standard than those drafted

by attorneys. *Haines*, 404 U.S. at 520. The mandated liberal construction means only that if the

Court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail,

it should do so. *Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999). A court may not

construct the plaintiff's legal arguments for him. *Small v. Endicott*, 998 F.2d 411, 417–18 (7th Cir.

1993). Nor should a court "conjure up questions never squarely presented." *Beaudett v. City of*

*Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

### B.     Dismissal Under Rule 12(c)

Defendants indicate they seek dismissal pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure. After the pleadings are closed—but early enough not to delay trial—a party may

move for judgment on the pleadings." Fed. R. Civ. P. Rule 12(c). Rule 12(c) motions "dispose of

cases in which there is no substantive dispute that warrants the litigants and the court proceeding

further." *See Lewis v. Excel Mech., LLC*, 2:13-cv-281-PMD, 2013 WL 4585873, at * 1 (D.S.C.

Aug. 28, 2013) (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure,

§ 1368 (3d ed. 2010)). Courts follow "a fairly restrictive standard" in deciding Rule 12(c) motions,

as "hasty or imprudent use of this summary procedure by the courts violates the policy in favor of

ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense." *See*

*Fitzhenry v. Indep. Order of Foresters*, No. 2:14-cv-3690-DCN, 2015 WL 3711287 (D.S.C. June 15, 2015) (internal citations omitted).

A motion for judgment on the pleadings is analyzed under the same standard as a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Burbach Broad. Co. of Del. v. Elkins Radio Corp*., 278 F.3d 401, 405–06 (4th Cir. 2002). Rule 12(b)(6) permits the dismissal of an action if the complaint fails "to state a claim upon which relief can be granted," and tests the legal sufficiency of the complaint pursuant to Rule 8 of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6). It "does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses." *See Doe 202a v. Cannon*, No. 2:16-cv-00530-RMG, 2018 WL 317818, at *1 (D.S.C. Jan. 8, 2018) (internal citations omitted).

## C.     Requirements for a Preliminary Injunction

The purpose of a preliminary injunction is to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit, ultimately to preserve the court's ability to render a meaningful judgment on the merits." *In re Microsoft Corp. Antitrust Litig*., 333 F.3d 517, 525 (4th Cir. 2003). A preliminary injunction is distinguished from a temporary restraining order only by the difference in notice to the nonmoving party and by the duration of the injunction. *U.S. Dep't of Labor v. Wolf Run Mining Co*., 452 F.3d 275, 281 n.1 (4th Cir. 2006) (comparing Fed. R. Civ. P. 65(a) with Fed. R. Civ. P. 65(b)).[4]

A preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand

---

[4] Defendants were provided notice and responded to Plaintiff's motion seeking injunctive relief. Therefore, the undersigned will construe Plaintiff's motion (Dkt. No. 96) as a motion for a preliminary injunction. *See* Fed. R. Civ. P. 65(a). Regardless, "[t]he substantive standard for granting either a temporary restraining order or a preliminary injunction is the same." *Dyke v. Staphen*, No. 6:18-cv-402-TMC-KFM, 2018 WL 2144551, at *1 (D.S.C. Apr. 19, 2018), *adopted by*, 2018 WL 2136062 (D.S.C. May 9, 2018); *see also Virginia v. Kelly*, 29 F.3d 145, 147 (4th Cir. 1994) (showing that the standard for a temporary restraining order is the same as that applied to motions for preliminary injunction).

it." *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991)) (internal quotation marks omitted). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)) (internal quotation marks omitted). Because granting a motion for preliminary injunctive relief "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way[,] [t]he danger of a mistake in this setting is substantial." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (quoting *Am. Hosp. Supply Corp. v. Hosp. Prods., Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986)) (internal quotation marks omitted). Accordingly, the decision whether to grant a preliminary injunction is committed to the equitable discretion of the district court. *See Salazar v. Buono*, 559 U.S. 700, 714 (2010); *Christopher Phelps & Assocs., LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007).

In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994). Under the Prison Litigation Reform Act ("PLRA"):

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system.

18 U.S.C. § 3626(a)(2). The current standard for granting preliminary injunctive relief is set forth in *Winter v. Natural Resources Defense Council, Inc*., 555 U.S. 7 (2008). Under *Winter*, to obtain a preliminary injunction, the moving party must demonstrate:

> 1) he is likely to succeed on the merits,
>
> 2) he will suffer irreparable harm if the preliminary injunction is not granted,
>
> 3) the balance of equities favors him, and
>
> 4) the injunction is in the public interest.

555 U.S. at 20; *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd*. 952 F.2d at 812 (citation omitted). Moreover, *Winter* requires that each preliminary injunction factor "be 'satisfied as articulated.'" *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013) (quoting *The Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds, Citizens United v. FEC*, 558 U.S. 310 (2010), *aff'd*, 607 F.3d 355 (4th Cir. 2010) (per curiam)). To succeed, Plaintiff must satisfy all four of these requirements. *Pashby*, 709 F.3d at 320–21. Therefore, the movant bears a heavy burden in seeking a preliminary injunction. *Id*. at 321.

## DISCUSSION

### A.    Defendants' Motions to Dismiss (Dkt. Nos. 92; 93)

In their Motions to Dismiss, Defendants argue that Plaintiff's claims are barred by the doctrine of *res judicata*, based on the stipulation of dismissal filed in *Green I*. (Dkt. Nos. 92; 93.) *Res judicata*, also known as claim preclusion, bars a party from relitigating a claim that was decided or could have been decided in an original suit." *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 161–62 (4th Cir. 2008). "The doctrine was designed to protect 'litigants from the burden

17

of relitigating an identical issue with the same party or his privy and [to promote] judicial economy by preventing needless litigation.'" *Id*. (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)). Generally, for the doctrine of *res judicata* to apply, there must be: (1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and later suit; and (3) an identity of parties or their privies in the two suits. *Martin v. Am. Bancorp. Ret. Plan*, 407 F.3d 643, 650 (4th Cir. 2005).

However, "the traditional *res-judicata* inquiry is modified in cases where the earlier action was dismissed in accordance with a release or other settlement agreement." *United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 913 (4th Cir. 2013). "When a consent judgment entered upon settlement by the parties of an earlier suit is invoked by a defendant as preclusive of a later action, the preclusive effect of the earlier judgment is *determined by the intent of the parties*." *Keith v. Aldridge*, 900 F.2d 736, 740 (4th Cir. 1990) (emphasis added). Because "[s]ettlement agreements operate on contract principles," the "preclusive effect of a settlement agreement should be measured by the intent of the parties." *Ohio Valley Env't Coal. v. Aracoma Coal Co*., 556 F.3d 177, 211 (4th Cir. 2009) (internal quotation marks and citation omitted). Accordingly, "where a dismissal is based on a settlement agreement, . . . the principles of *res judicata* apply (in a somewhat modified form) to the matters specified in the settlement agreement, rather than the original complaint." *Purdue Pharma*, 737 F.3d at 913 (internal quotation marks omitted); *see also E. Coast Repair & Fabrication, LLC v. United States through Dep't of Navy*, 16 F.4th 87, 90–91 (4th Cir. 2021) (noting, for purposes of *res judicata*, "[i]f a claim is resolved in a settlement agreement, [courts] look to the intent of the parties to determine whether the settlement agreement bars later claims).

In response to Defendants' Motions, Plaintiff asserts that the parties did not intend for the settlement agreement in *Green I* to bar Plaintiff's claims in this action. (Dkt. No. 131.) As noted above, the settlement agreement in *Green I* specifies, in bold, that **"[t]his Release . . . does not impact any other pending actions filed by Stephen J. Green."** (Dkt. No. 66-13.) The instant action was pending when Plaintiff signed the settlement agreement in *Green I* on December 23, 2024.[5] (*Id.*) Additionally, Plaintiff has submitted the December 23, 2024 letter from defense counsel which accompanied the settlement agreement for Plaintiff's signature in *Green I*. In this letter, defense counsel states, *inter alia*,

> Pursuant to our conversation on December 20, we have agreed to resolve the above case and also the two cases you have pending with Victor McDade with case numbers C/A No.: 24-cv-00267-BHH-MGB and C/A No. 2022-CP-23-03211. I have enclosed the Release and the Stipulations of Dismissal in the 3 cases. *I tried to be very careful with the language in the Release so that it only impacts the above 3 cases.* Per your request, I took out the words with prejudice in the Stipulation and included the agreed upon language "the case against the Defendants is forever ended."

(Dkt. No. 131-2 at 1 (emphasis added).)

Notably, in their Motions to Dismiss, Defendants do not acknowledge that the modified *res judicata* inquiry applies here because the dismissal in *Green I* was based on a settlement agreement. Given the bolded language within the *Green I* settlement agreement and the parties' express intention that the agreement "only impact[]" three specific cases, the undersigned recommends the instant action is not barred by the settlement agreement in *Green I. See Chin-Young v. United States*, 774 F. App'x 106, 117–18 (4th Cir. 2019) ("The settlement agreement itself controls the preclusive effect of the consent judgment in which it results.") Accordingly, Defendants' Motions to Dismiss (Dkt. Nos. 92; 93) should be denied.[6]

---

[5] The instant case was docketed on December 10, 2024, with a filing date of December 6, 2024. (*See* Dkt. No. 1.)

[6] While Defendants' Motions also seek dismissal of Plaintiff's claims arising before December 6, 2021 pursuant to the applicable statute of limitations, they expressly withdraw that argument in their reply briefs. (Dkt. Nos. 132 at 3; 133

**B.     Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction (Dkt. No. 96)**

In his Motion for Temporary Restraining Order and/or Preliminary Injunction, Plaintiff

asks the Court to issue a preliminary injunction

> enjoining  . . . Defendants . . . and all other persons acting in concert and participation with them (Illinois Dept. of Corr.) to cease: (1) Plaintiff's prolonged solitary confinement on S.D./A.D., denying policy prescribed level advancements, meaningful reviews, (2) housing Plaintiff under harmful and dangerous conditions, such as no fire suppressing equipment in cell (fire sprinkler), extreme heat/no air condition[ing] in cell; (3) housing Plaintiff in any state/prison without providing that state/prison Plaintiff's medical/mental health records, so as to ensure Plaintiff receives proper 'effective' timely treatment; (4) cease housing Plaintiff in any state/prison that does not provide Plaintiff the SCDC policy as well as South Carolina state an[d] federal law, and the settlement agreement privileges/rights to five days a week recreation, structured programming, unstructured programming, and any and all SCDC privileges an[d] laws Plaintiff would have enjoyed in South Carolina which comports with the Interstate Compact, SCDC policies, state/federal law, and that of the Mental Health Settlement Agreement.

(Dkt. No. 96 at 1–2.)

**A.     Arguments and Evidence**

In support of his Motion, Plaintiff submits what he describes as a "declaration," wherein

he largely repeats the allegations in his Amended Complaint concerning his time at the IDOC.[7]

(Dkt. No. 96-1 at 2–8.) Plaintiff has also submitted a memorandum in which he asserts he has

satisfied the *Winter* factors, and he has submitted certain medical records and classification records

in support of his Motion. (*Id*. at 8–25; Dkt. Nos. 96-4; 96-5; 96-6; 129-2; 129-3.) The parties have

---

at 3.) Because Defendants no longer seek dismissal under the statute of limitations, the undersigned does not address that argument.

[7] In his "declaration," Plaintiff does not swear to the truth of his statements under penalty of perjury. *See* 28 U.S.C. § 1746 (allowing unsworn declarations to have full force and effect if the writer subscribes the statement as true under penalty of perjury). However, the Amended Complaint is signed by Plaintiff and submitted under penalty of perjury and is therefore "verified." *Goodman v. Diggs*, 986 F.3d 493, 495 (4th Cir. 2021) (quoting *James v. Hale*, 959 F.3d 307, 314 (7th Cir. 2020)) ("A complaint is 'verified' if it is 'signed, sworn, and submitted under penalty of perjury.'").

both submitted the contract between South Carolina and Illinois, pursuant to the Interstate Corrections Compact (the "Contract"). (Dkt. Nos. 102-1; 129-1.)

In response to Plaintiff's Motion, Defendants assert that the Contract establishes that the IDOC "exercises day-to-day control over Plaintiff's custodial status, not SCDC."[8] (Dkt. No. 102 at 3.) Defendants argue that Plaintiff's Motion fails satisfy the *Winter* factors because, *inter alia*, Plaintiff "relies on conclusory statements" and Defendants "have strong defenses based on the affirmative defense of qualified immunity, especially considering that to prevail, Plaintiff will have to establish deliberate indifference on the part of these supervisory-level defendants." (*Id*. at 4.) Here, Defendants also assert that "to the extent Plaintiff complains of custody and treatment arrangements occurring prior to his transfer to the IDOC, these are complaints regarding past conditions that cannot be addressed by the granting of a preliminary injunction at this point." (*Id*. at 4–5.) Defendants state that

> Plaintiff is arguing for a preliminary injunction as if he were entitled to the custodial status and privileges of a model inmate, ignoring the fact that Plaintiff is known to have extensive prison gang involvement and that his current custodial arrangements are in no small part a result of convictions for murder, assault and battery by mob, and concealed weapons and conspiracy charges stemming from his involvement in a major prison riot that led to multiple deaths and injuries to both other inmates and correctional staff.

(*Id*. at 5.) According to Defendants, granting the relief requested in Plaintiff's Motion "would impact the ability of correctional facilities in two separate states to carry out their missions." (*Id*. at 5–6.) For these reasons, Defendants ask that the Court deny Plaintiff's Motion.

Under the Interstate Corrections Compact, Plaintiff's status as a South Carolina inmate remains unchanged. *See* S.C. Code Ann. § 24-11-20(c). South Carolina retains jurisdiction over

---

[8] Because the Group B Defendants "adopt the arguments contained in the Response filed by" the Group A Defendants (Dkt. No. 103), the undersigned treats the arguments in Dkt. No. 102 as being made by all the Defendants in this action. In their response, the Group B Defendants also assert that "they have no control over Plaintiff's housing, medical care, or other issues raised by Plaintiff in his Motion." (Dkt. No. 103.)

Plaintiff, and Illinois, as the receiving state, is obliged to provide "regular reports" to South Carolina "including a conduct record of each inmate." *Id*. at § 24-11-20(d). Additionally,

> All inmates who may be confined in an institution pursuant to the provisions of this compact shall be treated in a reasonable and humane manner and shall be treated equally with such similar inmates of the receiving state as may be confined in the same institution. The fact of confinement in a receiving state shall not deprive any inmate so confined of any legal rights which the inmate would have had if confined in an appropriate institution of the sending state.

*Id*. at § 24-11-20(e). Plaintiff is also entitled to receive "[a]ny hearing or hearings to which" he "may be entitled by the laws of [South Carolina]," and Illinois, as the "receiving state shall provide adequate facilities for such hearing conducted by the appropriate officials" in Illinois. *Id*. at § 4-11-20(f). Any hearings held in Illinois are governed by the laws of South Carolina and the record of such hearings are to be provided to South Carolina by Illinois. *Id*. Illinois officials "shall act solely as agents of the sending state and no final determination shall be made in any matter except by the appropriate officials of the sending state." *Id*. Plaintiff additionally has "any and all rights to participate in and derive any benefits or incur or be relieved of any obligations or have such obligations modified or the inmate's status changed on account of any action or proceeding in which the inmate could have participated if confined in any appropriate institution of the sending state located within such state." *Id*. at § 24-11-20(h).

The Contract between South Carolina and Illinois references the provisions in S.C. Code Ann, 24-11-10 *et seq.* and states that statute is "hereby made an integral part of this Agreement and no provision of this contract shall be construed in any manner inconsistent with the historical intent and the provisions of said Compact." (Dkt. No. 102 at 2.) Pursuant to the Contract,

> It shall be the responsibility for the administration of the institution in [Illinois] to confine inmates from [South Carolina]; to give them reasonable and humane care and treatment, including the furnishing including the furnishing of subsistence and all necessary medical and hospital services and supplies; to provide for their physical needs; to make available to them the programs of training and treatment

22

> which are consistent with their individual needs; to retain them in safe custody; to
> supervise them; to maintain proper discipline and control; to make certain that they
> receive no special privileges and that the sentences and orders of the committing
> court in the sending state are faithfully executed.

(*Id*. at 4.)

The classification records submitted by Plaintiff document his placement in RHU beginning July 9, 2021 because "inmate is a threat to the physical safety of other inmates or staff." (Dkt. No. 96-4 at 1.) These records document at least some of Plaintiff's classification reviews through March of 2025. (*Id*. at 1–23.) On March 17, 2025, the institutional classification committee met and recommended that Plaintiff be released from RHU and returned to the general population. (*Id*. at 23.) In his verified Amended Complaint, Plaintiff states he was "taken before an Interstate Compact Review on or about April 7, 2025," and he was transferred to the IDOC "within a matter of a few days." (Dkt. No. 72 at 41.) Plaintiff has submitted an IDOC "Notice of Administrative Detention Placement Review" form, which states that Plaintiff's "review" for "initial placement in administrative detention" will take place on April 29, 2025. (*Id*. at 26.) This form provides "the Department's rationale for [Plaintiff's] prospective or continued placement in Administrative Detention," including:

> GREEN is a documented member of the BLOODS Security Threat Group (STG).
> He was serving a life sentence for Assault & Battery- High & Aggressive Nature,
> Burglary 1st, Kidnapping, Armed Robbery, and Criminal Sexual Conduct 1st when
> he was indicted on charges for murder, conspiracy, assault and battery by mob, and
> possession of a weapon by an individual in custody for his role in South Carolina's
> deadliest prison riot.
>
> In 2018, at Lee Correctional Institution, GREEN was identified as one of several
> individuals involved in a BLOODS STG vs GANGSTER DISCIPLES/CRIPS STG
> prison riot. GREEN was identified by prison officials as stabbing a rival gang
> member several times and returning to stab him again resulting in the individual's
> death. . . .
>
> During his incarceration in South Carolina, GREEN was found guilty of several
> assaults on other individuals, possession of a weapon, use or possession of drugs,

> inciting or creating a disturbance, possession or attempt to possess a cell phone, STG affiliation, and sexual misconduct. Other notable charges include staff assault, smuggling or conspiracy to smuggle contraband, threatening to Inflict harm on an employee, and interfering with count.
>
> GREEN has shown a propensity towards violence, disregard for human life, and a willingness to possess and obtain dangerous contraband. He Is a documented member of the BLOODS STG and was a willing participant in the murder of a rival STG member. While Incarcerated GREEN has shown a constant disregard to follow the rules set in place to keep everyone safe. Due to the seriousness of GREEN's recent offenses, it is recommended GREEN is placed in Administrative Detention for the safety of individuals around him and staff members in charge of his custody.

(*Id*.) The form states, that [d]ue to individual in Custody GREEN Y68396 current Restrictive Housing Status, attendance to Initial Placement hearing is not granted pursuant to A.O. 05.12.101 Part I, Section 2." (*Id*.) A "follow-up review" took place on July 22, 2025, wherein Plaintiff continued to be held in administrative review detention based on the same above rationale. (*Id*. at 29–31.)

Plaintiff has submitted a portion of his medical and mental health records from SCDC, which include notes from his periodic telemedicine visits at the SCDC psychiatric clinic. (Dkt. No. 96-5 at 1–37.) These records document, *inter alia*, that Plaintiff has been diagnosed with "intermittent explosive disorder." (Dkt. No. 96-5 at 1–37.) On November 23, 2021, Plaintiff appeared "generally normal" upon examination, but a "full mental status exam" was recommended. (*Id*. at 1–2.) Plaintiff was prescribed Zyprexa "for psychosis and reported mood stability." (*Id*. at 4.) Notes dated March 8, 2022 document Plaintiff's change in medication to Geodon. (*Id*. at 6.) Notes from this visit describe Plaintiff's "mental status" as being in an "irritable" mood with a "severe[ly] . . . impaired ability to make reasonable decisions." (*Id*. at 7.) Notes from a May 17, 2022 visit describe Plaintiff's "mental status" as being in an "euthymic"[9]

---

[9] "Euthymia is a state of living without mood disturbances commonly associated with bipolar disorder. While in a euthymic state, you typically have feelings of cheerfulness and tranquility, as well as an increased level of resiliency

mood with a "moderate[ly] . . . impaired ability to make reasonable decisions." (*Id*. at 11.) Plaintiff

received counseling from a qualified mental health provider ("QMHP") on August 9, 2022. (*Id*. at

14–16.) Notes from a psychiatric clinic visit on November 15, 2022 document that Plaintiff is

diagnosed with "intermittent explosive disorder; LV 7/22 has refused all other visits scheduled;

Meds have expired was on Geodon 40mg bid, Vistaril 100 mg hs." (*Id*. at 17.)

> Notes from a psychiatric clinic visit on April 4, 2023 document:
>
> Inmate seen today for Psych F/U. MH4, last seen by Ms. Delambo at Ridgeland. There are some refusals so it's not clear whether he has been seen in the past 6 months. Inmate reports that he has been doing ok and has ups and downs with his mood but no chronic symptoms of depression. He has not participated in any groups at RHU but explained to him that there is a shortage of QMHPs for Saluda. Ms. Williams just saw him on 3/27/23. He reports that he has been able to cope with stress and has not felt more anxious or panicked. He describes himself as "fairly balanced." . . .
>
> Inmate reports that the Geodon has helped with hallucinations. He denies paranoia but reports that he does tend to feel some hyperreligiosity [sic]. . . .
>
> Inmate has been prescribed Depakote in the past . . . . Apparently he stopped taking the med when he developed a rash on his leg. . . . Will restart Depakote 250 mg po BID and closely monitor for skin related.

(*Id*. at 22–23.) Notes from a psychiatric clinic visit on July 7, 2023 document Plaintiff continued

to take Geodon and Depakote. (*Id*. at 24–27.) He stopped Depakote around September 22, 2023

due to a "skin reaction." (*Id*. at 29–32.) On May 20, 2024, Plaintiff underwent an "initial psych

intake in SSR." (*Id*. at 33–38.) At this time, Plaintiff was continued on ziprasidone "for AVH

[auditory verbal hallucinations], mood stabilization and to reduce anger outbursts" and

hydroxyzine "for insomnia." He was also prescribed trazodone "for insomnia" and fluoxetine "for

depression and anxiety." (*Id*. at 38.)

---

to stress." Euthymia and Bipolar disorder, *Healthline*, https://www.healthline.com/health/euthymic (last visited Oct. 10, 2025).

On August 23, 2024, a referral was entered for Plaintiff to visit the "MUSC spine clinic" within six weeks. (Dkt. No. 96-6 at 1–4.) The referral is based on Plaintiff's diagnosis of "spinal stenosis, lumbar region" and the results of Plaintiff's June 10, 2024 MRI. (*Id.*)

### B.    Analysis

Upon review, the Court finds that Plaintiff has failed to make the required showing under *Winter*. First, Plaintiff has failed to demonstrate a likelihood of success on the merits of his claims for injunctive relief. To meet this requirement, Plaintiff must "clearly demonstrate that he will *likely succeed* on the merits," rather than present a mere "grave or serious question for litigation." *Real Truth,* 575 F.3d at 346–47 (emphasis in original). Here, the undersigned focuses on those claims most relevant to the issues underlying the injunctive relief sought by Plaintiff. To the extent Plaintiff can seek relief against any SCDC Defendants based on his conditions of confinement and medical treatment at IDOC, the limited record before the Court does not indicate that any SCDC official held the requisite subjective knowledge required to prove a § 1983 deliberate indifference claim. *Thorpe v. Clarke*, 37 F.4th 926, 934 (4th Cir. 2022) (To demonstrate an intentional violation of the Eighth Amendment, "correction officers must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists' and actually 'draw the inference' before liability attaches" (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). And Plaintiff's involvement in the Lee prison riot suggests a legitimate penological justification for Plaintiff's prolonged detention in segregated confinement at SCDC and now IDOC. *See Porter v. Clarke*, 923 F.3d 348, 362-63 (4th Cir. 2019) ("[A] legitimate penological justification can support prolonged detention of an inmate in segregated or solitary confinement . . . even though such conditions create an objective risk of serious emotional and psychological harm."); *see also Thorpe v. Clarke*, 37 F.4th 926, 941 (4th Cir. 2022) ("Absence of penological purpose plays a part in

26

[conditions of confinement inquiry], as it helps establish that corrections officers acted with culpable mental state rather than for justifiable reasons"); *Lopez v. Robinson*, 914 F.2d 486, 490 (4th Cir. 1990) (looking to "institutional competence" and penological objectives to decide whether "prison administrators' conduct constitutes deliberate indifference").

As for any alleged due process violation based on Plaintiff's approximate four-year assignment to segregated housing at SCDC and IDOC, the record indicates Plaintiff has received the requisite periodic reviews. Even crediting Plaintiff's allegations about his alleged conditions in segregated housing, they fall somewhat short in magnitude to those described in *Wilkinson*, *Thorpe*, and *Incumma*—cases cited by Plaintiff and in which a cognizable liberty interest was found. *See Wilkinson v. Austin*, 545 U.S. 209, 213–15, 223–24 (2005)) (considering "Supermax facility" where inmates were placed "for an indefinite period of time, limited only by an inmate's sentence" and subject to "extreme isolation" where "almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room"); *Thorpe*, 37 F.4th at 931, 942 (4th Cir. 2022) (noting plaintiffs are "prisoners living in long-term solitary confinement—some as long as 24 years"; during this time, they "must remain in their cells for about 23 hours per day, have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates, have rare visitations "conducted through glass walls, and must live—and sleep—with the light on at all times" (internal quotations omitted)); *Incumaa v. Stirling*, 791 F.3d 517, 531 (4th Cir. 2015) (considering "an exceptional 20–year stint in highly restrictive solitary confinement"). In short, the limited record before the Court does not establish Plaintiff is likely to succeed on the merits of this § 1983. *See Di Biase v. SPX*

*Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (stating the moving party must "clearly establish[ ]" entitlement to the injunction he wants).

Next, Plaintiff has failed to make a clear showing that he will suffer irreparable harm absent the injunctive relief. On this issue, Plaintiff relies largely on his own conclusory assertions—his submitted medical record documents only a portion of his treatment at SCDC through August 23, 2024. Plaintiff's showing on this *Winter* factor is insufficient; "the clear showing of irreparable harm proffered by the movant cannot be either remote or speculative; it must be both actual and immediate." *Al-Abood v. El-Shamari*, 71 F. Supp. 2d 511, 514 (E.D. Va. 1999) (citing *Dan River, Inc. v. Icahn*, 701 F.2d 278, 284 (4th Cir. 1983)).

Finally, Plaintiff has failed to establish that the balance of equities tips in his favor, and he has failed to show that an injunction is in the public interest. As the Fourth Circuit explained in *Wetzel v. Edwards*:

> The realities of running a penal institution are complex and unique to the prison environment. Federal courts have traditionally been reluctant to interfere in the problems of prison administration. Indeed, the decisions made by prison administrators in their informed discretion have been accorded "wide-ranging deference" by the federal courts. . . . *Furthermore, federal courts have an additional reason to show deference to the decisions of prison authorities, where a state penal institution is involved. Procunier v. Martinez, [416 U.S. 396 (1974)].* The possible injury to the defendant-appellants if the preliminary injunction stands is potentially grave. The informed discretion of these penological experts could be radically limited with respect to inmate transfers specifically and, more importantly, with respect to prison discipline in general.

635 F.2d 283, 288 (4th Cir. 1980) (emphasis added).

Granting an injunction to transfer Plaintiff to a different institution or to change his custody level would require reversing prison administrators' decisions regarding Plaintiff's classification and prison assignment. The undersigned cannot conclude that the public interest would be best served by mandating such extraordinary relief where the current record consists mainly of

Plaintiff's allegations. *See Bell v. Wolfish*, 441 U.S. 520, 540 n.23 (1979) (explaining that day-to-day administrative decisions "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.") (quoting *Pell v. Procunier*, 417 U.S. 817, 824 (1974)); *see also Direx Israel, Ltd.*, 952 F.2d at 811 ("Federal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it.").

As Plaintiff has not demonstrated a likelihood of success on the merits or more than a possibility of irreparable harm, and because the balance of the equities and the public interest involved do not warrant the extraordinary remedy of injunctive relief, Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction (Dkt. No. 96) should be denied.

## **CONCLUSION**

Based on the foregoing, it is RECOMMENDED that the Court DENY Defendants' Motions to Dismiss (Dkt. Nos. 92; 93) and DENY Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction (Dkt. No. 96).

Although granting injunctive relief is not warranted, some explanation is needed from Defendants as to whether Plaintiff's medical and mental health records from SCDC have been sent to IDOC. Defendants are ORDERED to submit a status report by **October 24, 2025**, clarifying whether these records have been sent to IDOC.

October 14, 2025

Charleston, South Carolina

_____

MARY GORDON BAKER

UNITED STATES MAGISTRATE JUDGE

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.**  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).